IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**ANTHONY D. BADY,**

**Defendant.**                                            **No. 11-30192-DRH**

## MEMORANDUM and ORDER

**HERNDON, Chief Judge:**

### I. Introduction and Background

Pending before the Court is Bady's motion to suppress (Doc. 21). The government opposes the motion (Doc. 24). On February 23, 2012, the Court conducted a suppression hearing, heard testimony and took the matter under advisement. Based on the following, the Court denies the motion to suppress.

On October 19. 2011, the grand jury charged Anthony D. Bady with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)(Doc. 1). On December 12, 2012, Bady was arraigned before Magistrate Judge Stephen Williams and remanded to the custody of the U.S. Marshal pending trial.

On December 30, 2011, Bady moved to suppress all evidence obtained as a

result of an illegal search and seizure on May 7, 2011 (Doc. 21). Drawing the facts from the testimony and exhibits introduced at the suppression hearing, the Court summarizes the events of May 7, 2011.

On that day, Illinois State Police trooper Larry Lohman was working as part of the "WAVE" (Working Against Violent Elements) task force and patrolling with "MEGSI" (Metropolitan Enforcement Group of Southwestern Illinois) agent Joshua Hubbard, a city of Fairview Heights, Illinois police officer, in East St. Louis, Illinois.[1] Around 2:45 a.m., the officers were patrolling a high crime area in East St. Louis in and around Martin Luther King Drive and Collinsville Avenue.[2] The officers were riding in an unmarked Dodge pick-up truck. Hubbard was driving. Both officers wore clothes that identified themselves as police officers and both officers had badges.

While patrolling that area, the officers observed a red Alero parked behind a parked tan car on the north east side of the street and observed the passenger of the Alero get out and walk to the passenger side of the tan car. The tan car did not appear to be occupied. The officers were interested in what the passenger was doing and they were concerned that he might have been breaking into the car. Hubbard passed the Alero, made a u-turn, activated the emergency lights and pulled his

---

[1] WAVE is a collaboration of law enforcement officers from the Illinois State Police, MEGSI, the St. Clair County (Illinois) Sheriffs Department, the East St. Louis Police Department, the F.B.I., the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the U.S. Marshals Service.

[2] Evidence was submitted and it is undisputed that this is an area plagued by crime including murders, shootings, shootings inside nightclubs, robberies, car hijackings, car break-ins, drug activity and mob activity.

vehicle at an angle directly in front of the Alero with his vehicle six to ten feet from the front of the Alero. As Hubbard was making the u-turn, the officers saw Bady quickly return to the Alero.

After the lights were activated and after the officers' vehicle was parked, the Alero backed up and it appeared to the officers that the Alero was trying to leave. The officers got out of the car and ordered the driver to stop, which he did. Lohman walked to the passenger's side of the Alero and Hubbard walked to the driver's side of the red Alero. As Lohman was approaching Bady, Bady got out of the Alero and "quickly" walked towards Lohman. Lohman directed Bady back inside the car and Bady complied. Lohman asked Bady for identification and Bady gave it to him. Lohman then asked Bady what he was doing and Bady did not respond. Lohman also asked Bady if he had anything that he should not have and Bady did not respond.

Lohman directed Bady to step out of the vehicle and asked him if he had any weapons which, again, resulted in no response. Thereafter, Lohman conducted a pat-down search of Bady and found a small cellophane bag that contained marijuana in Bady's front pant pocket. Bady admitted to Lohman that it was marijuana. After finding the marijuana, Lohman asked Bady to move and Lohman leaned in the passenger seat with one knee and saw the end of the Glock model gun in between the console and the seat.

Lohman testified that he was in the car about ten seconds before he saw the gun and that it was in plain view. Lohman also stated that the total encounter with

Bady lasted between three and five minutes. Lohman did not give Bady his *Miranda* rights before he patted him down or searched the car.

While Lohman was with Bady, Hubbard spoke to the driver of the Alero, A. Collier. The driver told Hubbard that the car belonged to his girlfriend. The driver made no incriminating statements. While Hubbard was talking to the driver, Lohman told Hubbard that he found a gun.

Thereafter, FBI agent Daniel Cook arrived on the scene at 2:54 a.m. Cook read Bady his *Miranda* rights, Bady waived those rights, and gave Cook a statement at 3:18 a.m. Bady indicated that he was with a friend from St. Louis and that they were going to a strip club in Brooklyn, Illinois called "Bottoms Up." He also stated that when he saw law enforcement he got out of the car and was told to get back in the car. He indicated that he got out of the car because he had a gun and he did not want the gun to be found. He also stated that he knew the gun was loaded but that he did not load the gun. He further stated that the car was not his.

In moving to suppress, Bady claims that his initial detention was illegal, thus all the evidence seized is "fruit from the poisonous tree."

## II. Analysis

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment "guarantees the privacy, dignity, and security of persons against arbitrary and invasive acts by officers of the Government." *City of Ontario, California v. Quon,* ––

U.S. ——, 130 S.Ct. 2619, 2627, 177 L.Ed.2d 216 (2010). Put simply, the Fourth Amendment "requires searches and seizures to be reasonable." *United States v. Jennings,* 544 F.3d 815, 818 (7th Cir.2008), *citing Illinois v. McArthur,* 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). However, not all police-citizen encounters implicate Fourth Amendment protections against unreasonable searches and seizures. *Id.* The Seventh Circuit has recognized three categories of police-citizen encounters: 1) arrest, requiring police to have probable cause to believe the person has committed a crime or is committing a crime, 2) investigatory stop, limited to a brief non-intrusive detention, based on reasonable suspicion that the person has committed or is committing a crime (often referred to as a *Terry* stop), and 3) "an officer seeking the citizen's voluntary cooperation through *non-coercive questioning*" (not a seizure within the Fourth Amendment). *Id.* (italics added) (citing *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir. 1990)).

Because not all police-citizen encounters implicate the Fourth Amendment, the threshold question is whether a seizure has occurred. *United States v. Borys,* 766 F.2d 304, 308 (7th Cir. 1985) (citing *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Terry,* 392 U.S. at 19 n. 16; *United States v. Morgan,* 725 F.2d 56, 58–59 (7th Cir. 1984)). Once it is determined that a person has been seized, the court determines whether under a totality of the circumstances, the seizure was objectively unreasonable. *Scheets,* 188 F.3d at 836.

The first issue a court must determine is when defendant was actually "seized" for purposes of the Fourth Amendment. The test for when an encounter between a

law enforcement officer and a citizen rises to the level of a seizure is an objective one. *United States v. Espinosa–Alvarez,* 839 F.2d 1201, 1205 (7th Cir. 1988). Under the Fourth Amendment, a seizure occurs when "a reasonable person in the position of the defendant would believe that his liberty has been restrained." *United States v. Lewis,* 608 F.3d 996, 1000 (7th Cir. 2010). The government implicitly argued that this was a *Terry* stop and defendant argued that his seizure and subsequent searches violated his rights.

The Constitution permits a police officer to conduct an investigatory stop (also known as a " *Terry* stop") that demands only a limited intrusion into the person's privacy, so long as that stop is based on " 'specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *United States v. Baskin,* 401 F.3d 788, 791 (7th Cir.2005) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In other words, a *Terry* stop is permissible where the police officer has "reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *Id.* In making a reasonable suspicion assessment, " 'it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *United States v. Mancillas,* 183 F.3d 682, 695–96 (7th Cir.1998) (quoting *Terry,* 392 U.S. at 21–22). The real issue is whether the police officer's conduct was reasonable, given the officer's suspicions and the surrounding circumstances. *Id.*

The decision to make the *Terry* stop "must have been justified at its inception." *Baskin,* 401 F.3d at 791. It must also be "reasonable in scope and duration and officers are permitted to take reasonable steps to insure their own safety." *United States v. Jackson,* 300 F.3d 740, 746 (7th Cir. 2002) (citing *Terry,* 392 U.S. at 30). "Accordingly, the search must 'be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.' " *Id.* (quoting *Terry,* 392 U.S. at 29). The length and scope of an individual's detention must be tailored to the stop's underlying justification. *See Scheets,* 188 F.3d at 838. Courts must assess whether the police officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharp,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

Whether an investigatory stop is lawful depends on whether, under a totality of the circumstances, the officers' conduct was objectively reasonable. *Mancillas,* 183 F.3d at 695–96. This includes the experience of the officers and the behavior of the defendant. *United States v. Swift,* 220 F.3d 502, 506 (7th Cir. 2000); *Cady v. Sheahan*, 467 F.3d 1057, 1061-62 (7th Cir. 2006), cert. denied 551 U.S. 119 (2007) (a suspect's nervous or evasive behavior is a pertinent factor to the reasonable inquiry). An officer also may consider the characteristics of the location when sizing up the situation. *Oglesby*, 597 F.3d 891, 984 (7th Cir. 2010), citing *Wardlow*, 528 U.S. at 124; *United States v. Brewer*, 561 F.3d at 676, 679 (7th Cir. 2009) . In other words, presence in a high-crime area location is one relevant circumstance. *United*

*States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002). Clearly, though, an individual's presence in a high-crime area cannot, in and of itself, support a particularized suspicion that a subject is committing a crime. *Oglesby*, 597 F.3d at 984, citing *Wardlow*, 528 U.S. at 124.

The Supreme Court has stated that reasonable suspicion is a much lower standard than the "fair probability" requirement of probable cause. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' ... and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause ....") (internal citations omitted); *see also Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "Reasonable suspicion has been defined as 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.' " *United States v. Ienco,* 182 F.3d 517, 523 (7th Cir. 1999) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

In determining whether the *Terry* stop was reasonable, courts must first determine if the law enforcement officer's actions were justified at the inception of the

encounter, and then determine whether the actions taken were reasonably related in scope to the circumstances which justified the stop in the first place. *Id.* In examining these two issues, courts look to " 'whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and ... whether the degree of intrusion was reasonably related to the known facts.' " *United States v. Duguay,* 93 F.3d 346, 350 (7th Cir. 1996).

Applying the law to the facts of this case, the initial stop was justified at its inception as it was based on a reasonable suspicion of criminality supported by articulable facts. The defendant argued that in cross examination, the officers Lohman and Hubbard conceded that the activity they witnessed did not constitute criminal activity. Defendant's analysis of the law to the facts is that this was an illegal stop as a consequence. The defendant misses the mark. As the case law establishes above, law enforcement need not articulate actual criminal activity, but must articulate facts which give rise to reasonable suspicion of criminal activity. Based on the totality of the circumstances of this case, the officers had reasonable suspicion that Bady was about to commit or was committing the crime of car-jacking, car theft, theft of property within a car or drug dealing. The events that led to this stop occurred in the late night/early morning hours (2:45 a.m.) in a crime plagued area known for many crimes including car-jacking and drug dealing. When the officers first detected the Alero and Bady, they observed Bady, who was the passenger of the Alero, approaching a tan car on the *passenger* side that appeared to be unoccupied. This conduct appeared to be suspicious to the officers and the conduct appeared to

them to coincide with car-jacking, a theft or drug dealing.  The officers passed Bady and the tan car, made a u-turn and observed Bady quickly returning the passenger seat of the Alero.  Next, the officers, in an effort to make contact with Bady, parked their vehicle at an angle from the front of the Alero.  At that time the emergency lights were on and the Alero attempted to back up and leave the scene.  These initial facts constitute more than a "hunch" that criminal activity is occurring or about to occur.  Considering all the circumstances known to the officers at the time of the encounter (including the officers' experience, the early morning hours, the high crime area, and Bady's actions), the Court finds that the officers had a "reasonable suspicion based on articulable facts that a crime [was] about to be or [had] been committed." *Carlisle*, 614 F.3d at 754.

Further, the Court finds that the actions taken by the officers were reasonably related to the circumstances.  Trooper Lohman found it unusual that Bady would exit the car and walk "quickly" toward him as he approached the car, raising the officer's suspicions regarding Bady's activities all the more.  The pat down search of Bady and the search of the area of the Alero where Bady was sitting were limited in scope and done for the officers' safety based on Bady's actions.  Lohman's safety was at risk because he was dealing with someone he believed to have been trying to steal a car or the contents of the car.  During this time, Bady was not handcuffed. The duration of the encounter with Bady lasted only three to five minutes.  In fact, the view of the car, it could hardly be called a search since the trooper only leaned in and looked down, took about ten seconds and the Glock was in plain view between the console

and seat. In sum, Lohman conducted a reasonable *Terry* stop and everything he performed was within the permissible scope of the stop. Due to the Court's analysis, it need not go into the analysis of the view/search of the car and whether the defendant has the right, he does not, to object to such an intrusion into the car, since he was not the owner of the car and only a passenger in the car.

### III. Conclusion

Accordingly, the Court **DENIES** the motion to suppress (Doc. 21). The Court **SET**S this matter for jury trial for April 2, 2012 at 9:00 a.m.

**IT IS SO ORDERED**.

Signed this 29th day of February, 2012.

David R. Herndon
2012.02.29
16:04:36 -06'00'

Chief Judge
United States District Court